

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

ALB:BTK
F. #2008R01993

*610 Federal Plaza*
*Central Islip, New York 11722*

April 22, 2020

<u>By ECF & E-mail</u>

The Honorable Arthur D. Spatt
United States Magistrate Judge
United States District Court
Eastern District of New York
Central Islip, New York 11722

        Re:    United States v. Mohammad Nawaz
                   Docket No. 18-CR-405 (ADS)

Dear Judge Spatt:

        On or about July 15, 2019, the Honorable Gary R. Brown entered a Permanent Order of Detention, remanding the defendant following his arrest on a warrant that issued for his August 7, 2018 Indictment for Conspiracy to Commit Bank Fraud (the "Indictment"). The Indictment was based upon the defendant's orchestration of a "credit card bust out" scheme that operated between approximately 2003 and 2009, which defrauded financial institutions of approximately $1.3 million. In issuing the Permanent Order of Detention, Judge Brown concluded that there was a "serious risk" that the defendant would flee from the jurisdiction. <u>See</u> ECF No. 53 (July 15, 2019).[1] That conclusion was entirely reasonable because on or about July 15, 2018, the defendant—a citizen of Pakistan—left the United States from John F. Kennedy International Airport in Queens ("JFK") and did not return to New York until he was arrested on a warrant on or about July 15, 2019, nearly one year to the day after he left New York. During this time, in October 2018, the defendant's brother

---

[1] Judge Brown's conclusion echoed that of Pretrial Services, which concluded that there was "no condition or combination of conditions that can reasonably assure the defendant's future appearance in court or the safety of the community." <u>See</u> July 15, 2019 Pretrial Services Report at 4 ("Pretrial Report") (on file with Court). In recommending a Permanent Order of Detention, Pretrial Services was presented with—and rejected—the potential of defendant's wife serving as a suretor and his residing with her in Maryland, essentially the same bail package that the defendant proffers now. <u>See</u> <u>id.</u> at 2.

and co-conspirator, Ali Mushtaq, was arrested based upon the same Indictment issued against the defendant. Nonetheless, the defendant remained abroad as a fugitive. None of these facts has changed. And in the interim, the defendant has been furnished with discovery that overwhelmingly proves his guilt of the bank fraud conspiracy charged in the Indictment, including tape recordings that a cooperating witness—one of several who will testify at trial—made of the defendant discussing the bust out scheme. Accordingly, the defendant's motion for bail should be denied.[2]

The defendant's arguments concerning his general concerns about exposure to COVID-19 do not alter this conclusion. Indeed, the Bureau of Prisons ("BOP") has taken appropriate precautions to ensure the health and safety of the defendant, other inmates and its staff. Indeed, while the defendant cites no legitimate medical concern that would increase his risk of infection, BOP staff has reasonably limited his movements and activities and those of other inmates as a precautionary measure to ensure the health and safety of other inmates and staff. Moreover, the defendant's only basis for seeking release based upon the COVID-19 situation is a risk of possible exposure; the defendant cites no objective medical reason justifying his release. As such, there is no "compelling reason" for the Court to alter the previously imposed Permanent Order of Detention and the defendant's motion should be denied.

## FACTS

I.  The Defendant's Bank Fraud Scheme

Between approximately January 1, 2003 and February 28, 2009, the defendant and his co-conspirators recruited financially unsophisticated individuals, including taxi drivers and gas station attendants, who were predominantly of Indian and Pakistani descent (collectively, the "straw owners") and promised them large cash payments of as much as $40,000 in exchange for the straw owners' personal identifying information and, in some cases, the personal identifying information of the straw owners' family members. Armed with that information, the defendant and his co-conspirators fraudulently established credit card accounts in the straw owners' names. In addition, the defendant and his co-conspirators established shell corporations, including "Own Dream, Inc.," "Huda Enterprises, Inc." and

---

[2] This opposition to the defendant's motion for release replaces the government's April 21, 2020 opposition. In that opposition, the government included information concerning a record of arrests and prosecutions that was located based upon a search for the defendant's name and other personal identifying information. A subsequent review of a record of arrests and prosecutions based upon the defendant's fingerprints, however, demonstrates that the record of arrests and prosecutions described in the government's April 21, 2020 opposition is not associated with the defendant. Accordingly, the government withdraws that opposition and relies solely on the arguments made in the present opposition.

2

"Deer Park Marble" (collectively, the "Shell Corporations") and credit card processing accounts for the Shell Corporations.

Thereafter, the defendant and his co-conspirators caused fraudulent credit card charges to be made with the credit cards that they obtained in the straw owners' names. In some cases, these charges were made at unsuspecting retail establishments that were not involved in the fraudulent scheme. In other cases, the defendant and his co-conspirators used the straw owners' credit cards to make fraudulent charges on the Shell Corporations' credit card processing accounts. As set forth in the Indictment, these fraudulent charges were not repaid to the banks that issued the credit cards. Overall, the government estimates that the defendant's actions caused at least $1.3 million in losses to financial institutions.

As the defendant is well-aware based upon the government's discovery, his discussions of fraudulent activities were recorded during conversations that the defendant and other co-conspirators had with the straw owners, some of whom recorded these conversations during an Federal Bureau of Investigation ("FBI") investigation into the defendant's fraudulent scheme and who will testify concerning those conversations and other fraudulent activities that they engaged in at the behest of the defendant and his co-conspirators at trial. For example, during a recorded conversation on September 10, 2018, at approximately 2:32 p.m., the defendant, who is referred to in the conversation as "Bhatt Sahbib," informed one of the straw owners (the "CW") that the CW would need to "stay with [the defendant] for a week" and that the CW would potentially need to travel with the defendant to "Florida or Las Vegas." As result, the defendant inquired about how much time the CW could "take off from work" to "stay" with the defendant. The defendant further requested that the CW meet him in "Queens" and the defendant explained that he and the CW needed to "make a program" because they had "a lot of work" to do. In substance, the CW will testify at trial that "work" was a reference to making fraudulent charges on credit cards that the defendant and his co-conspirators acquired using the CW's identifying information.

That the defendant and the CW were engaged in a credit card fraud was made explicit in another recorded conversation on September 12, 2008, at approximately, 3:13 p.m., when the defendant asked the CW "where are the rest of the things." In response, the CW asked whether the defendant was referring to the "cards," or credit cards, the defendant replied "Yes." The CW then stated, in substance, that he had given the credit cards to another straw owner to be delivered to the defendant. The evidence at trial will prove that approximately $348,000 in fraudulent charges were made on credit cards that the defendant obtained using the CW's identifying information. The CW will testify, in substance, that he provided his personal identifying information and credit cards to the defendant knowing that fraudulent charges would be made on those cards in exchange for a promised payment of approximately $40,000.

Other recorded communications demonstrate that the defendant knew that the credit cards that he obtained using the CW's personal identifying information were being used to incur charges that were not repaid to banks. For example, in a recorded conversation

3

on September 17, 2008, at approximately 5:45 p.m., the CW informed the defendant that he had not picked up mail related to credit cards established in the CW's name in a "long[] time" and, as result, mail related to those credit card was "piling up." Amongst this mail, the CW told the defendant, were "delinquent account letters."

In another example, on September 25, 2008, at 2:13 p.m., the defendant directed CW to a Bank of America branch in Astoria, New York. Once in that location, the defendant directed CW to withdraw $5,000 from a business checking account that the defendant and his co-conspirators established in CW's name. Around the time of this call, FBI agents surveilled CW entering a Bank of America in Astoria, New York. The CW will testify at trial that the defendant drove him to the Bank of America and instructed him to withdraw the $5,000 from an account that the defendant and his co-conspirators established using CW's identifying information.

One day later, on September 26, 2008, at approximately 2:26 p.m., the defendant instructed the CW to make charges of $10,000 on a PC Richard's credit card and $4,000 on a Bank One credit card. During the conversation, the defendant asked the CW whether the CW had "done it for PC Richards (sic) yet[?]" When the CW replied that he had not, the defendant stated "do one for 10,000 and the other one which says Bank One on it do four." The defendant further told CW to tell the defendant when "it" was done. At trial, the CW is expected to testify that the defendant was instructing CW to make $10,000 in charges on a PC Richard's credit card and $4,000 on a Bank One credit card, knowing that the charges would not be repaid.

A review of a bank account established in the defendant's name at TD Bank demonstrated that during the approximate six-year period set forth in the Indictment the defendant's bank account had deposits of approximately $374,000 and disbursements of approximately $374,000. Included in these transactions were approximately $138,000 in cash deposits and $46,000 in checks from co-conspirator Zaheda Gonzalez. During this time period, the defendant withdrew over $54,000 in cash and $10,000 in checks made payable to cash. In addition, during the scheme, the defendant and his co-conspirators purchased electronic devices, such as laptops, camcorders and iPods, using fraudulently obtained credit cards, which could easily be resold at a substantial profit. The government has yet to recover the large amount of cash that the defendant had access to during the conspiracy or to determine the location of the proceeds that the defendant acquired based upon his fraudulent scheme.

II.   The Defendant's Significant International Travel History

The defendant is a citizen of Pakistan. Although he is currently a lawful permanent resident of the United States, a conviction in this case will almost certainly result in his deportation to Pakistan. Between 2002 and his arrest on July 14, 2019, the defendant repeatedly travelled internationally, often staying outside of the United States for months at a time. For example, on December 14, 2005, the defendant travelled from JFK to Bombay, India and returned to New York on or about April 12, 2006. Similarly, on October 24, 2009

4

the defendant travelled from New York to Lahore Pakistan, returning on July 19, 2010. Thereafter, on or about July 15, 2018, the defendant travelled from Dulles Airport in Washington, D.C. to Doha in Qatar.

On or about August 7, 2018, the defendant was indicted. About three months later, the defendant's brother and co-conspirator, Ali Mushtaq, was arrested and remanded based upon the same Indictment. As the defendant concedes, while he was present in Pakistan, he was aware that his brother was indicted and that he would be arrested on the same Indictment upon his return to the United States. And, yet, even after the defendant's wife and children left Pakistan for the United States, the defendant remained there for nearly a year and resided with his mother, only "eventually" returning on or about July 15, 2019, approximately one year after he left the United States in July 2018. See Def.'s Mot. at 2, 5 (ECF No. 95).[3] As such, the defendant resided abroad for approximately one year, despite the fact that his wife and children—whom he now invokes in seeking release—were present in the United States without him.

III. The Defendant's Status at MDC

During communications with counsel for BOP's Metropolitan Detention Center ("MDC"), where the defendant is currently housed, the government learned that the defendant—who is approximately 46 years old—currently shares a cell with one other inmate. Other than being recently referred for a colonoscopy and his current complaints of "gall stones," see Def.'s Mot. at 3, the defendant is in generally good health. In his two-person cell, the defendant had access to hot water, soap, a sink and a toilet and is regularly transported to a showering area by BOP staff, who are dressed in appropriate protective gear. In addition, like all MDC inmates, the defendant has been provided with a surgical mask, which will be replaced each week.

ARGUMENT

I. Legal Standard for Detention

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e). The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the crimes charged; (2)

---

[3] Contrary to his suggestion, see Def.'s Mot. at 2, the defendant's return to New York on or about July 15, 2019 was not straightforward. The defendant did not board two flights that he was listed as passenger on, which were scheduled to arrive at Dulles Airport in Washington, D.C., thereby making it more difficult for the FBI to coordinate his eventual arrest at JFK. Because his brother was remanded in the present case for approximately nine months before his return to the United States, the defendant could have easily arranged his surrender to the FBI. Of course, he did no such thing.

5

the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g); see also United States v. Jacobson, 502 F. App'x 31, 32 (2d Cir. 2012). The government must support a finding of dangerousness by clear and convincing evidence, see United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), and a finding of risk of flight by a preponderance of the evidence, see United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); see also United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

II. The Defendant Should Continue to be Detained Pending Trial

A. The Defendant, a Former Fugitive, is an Extreme Flight Risk

The defendant constitutes an extreme flight risk due to the seriousness of the offenses, the strength of the evidence, the severity of the penalties that the defendant faces, his significant ties to Pakistan, and his history of international travel—which includes a stint of residing for nearly one year in Pakistan knowing that he was a fugitive.

First, the defendant used other individual's identities to fraudulently establish credit cards and bank accounts, which he and his co-conspirators used to steal at least $1.3 million from banks. In some cases, these charges were made at fictitious businesses that the defendant and his co-conspirators established. Given the defendant's ready use of others' personal identifying information to defraud financial institutions, it is reasonable to infer that he will flee to avoid responsibility for his illegal acts. This is especially so given his close connection to family in Pakistan. See United States v. Giordano, 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) ("Relevant factors that support a serious risk finding include . . . unstable residential ties to a community, efforts to avoid arrest, or hidden assets. Evidence of a serious intent to flee the country in response to an indictment also justifies detention as a serious risk of flight.") (internal citations omitted).

Second, the weight of the evidence against the defendant is overwhelming. Tape recorded conversations captured the defendant directing the CW to make fraudulent credit card charges, to withdraw cash advances from a bank and to provide the defendant with credit cards that were mailed to the CW. The CW's testimony and the testimony of other cooperating witnesses, whom the defendant also directed to engage in fraud, will only amplify this damning evidence of the defendant's guilt at trial. Where, as here, the evidence of guilt is strong, it provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"). And the evidence shows that the defendant has an ability to act upon this incentive because he has significant ties to Pakistan, his country of origin, where he has travelled repeatedly, and because he resided in Pakistan, away from his family for a nearly a year after the Indictment was issued against him, all the while knowing that he was fugitive.

Moreover, the government's investigation established that the defendant had access to large amounts of cash during his scheme and that he orchestrated the purchase of

6

high-priced electronics and gift cards that could easily be resold at a substantial profit. Taken together, these facts demonstrate that the defendant likely has access to significant assets that could be used to facilitate his flight. Such a conclusion weighs in favor of detention. See United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007). Where the amount involved in criminal case cannot be accurately determined, courts have erred on the side of caution and ordered the defendants detained. See United States v. Londono-Villa, 898 F.2d 328, 329 (2d Cir. 1990) (reversing release on bail based on flight risk where bail proposed amounted to much less than the money potentially involved in the crime); United States v. Amico, 2006 U.S. Dist. LEXIS 60996 (W.D.N.Y. 2006) (defendant found to be a flight risk where large amounts of money went unaccounted for in fraud scheme); United States v. Lugo-Rios, 2006 U.S. Dist. LEXIS 49657 (D.P.R. 2006) (defendants found to be a flight risk where the amount of money stolen from health care fraud scheme could not be determined). The Court should reach the same conclusion in this case.

Finally, the significant term of imprisonment that the defendant faces creates a substantial incentive to flee. The possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight,"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). Here, if convicted, the government estimates that the defendant's advisory sentencing range under the United States Sentencing Guidelines to be 37-46 months' imprisonment. Accordingly, the defendant has a great incentive to flee.

B. The Defendant is a Danger to the Community

Given the defendant's orchestration of a wide-ranging, nearly six-year-long bank fraud scheme, involving multiple straw owners and shell corporations, his release would create the substantial risk that he would continue to perpetrate fraud against financial institutions and others. United States v. Reynolds, 956 F.2d 192, 192 (9th Cir. 1992) ("We agree with the district court that [the defendant] has failed to show by clear and convincing evidence that he does not constitute an economic danger to the community. We further hold that danger may . . . encompass pecuniary or economic harm."). Furthermore, the defendant's release would pose a severe threat of witness intimidation to the cooperating witnesses, who are prepared to testify against the defendant at trial and whose identities the defendant has likely gleaned from the discovery that the government has provided to him. United States v. Melendez-Carrion, 790 F.2d 984, 1002 (2d Cir. 1986) ("Pretrial detention

may also be validly imposed whenever substantial evidence indicates that a defendant, if released, would intimidate or injure witnesses . . . .").[4]

### III.  Release Is Not Warranted Under the "Compelling Reason" Clause

The defendant seeks pretrial release by claiming that he is at-risk for contracting COVID-19, a respiratory illness that can spread from person to person. Under 18 U.S.C. § 3142(i), a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release. For example, the Honorable Jack B. Weinstein agreed to the release of Colombo family captain Gregory Scarpa when that defendant was terminally ill with AIDS, was not expected to live until trial, and his medical condition could not be managed appropriately by prison medical facilities. United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993). Even in those extreme circumstances, release was conditioned on the defendant being confined to a hospital under 24-hour guard of the United States Marshal Service, to be reimbursed by the defendant's family. Id. at 92.

Here, the defendant's claims do not relate to any actual medical condition, but to concern about potential exposure to COVID-19, the risk of which is being appropriately managed by the BOP.[5] Indeed, the facts show that the BOP is effectively managing the COVID-19 risk at MDC. Thus, the real risk here is releasing the orchestrator of a wide-ranging bank fraud scheme, who is likely to flee from prosecution and attempt to intimidate cooperating witnesses.

---

[4] Regardless of the defendant's claims about the reasons for the issuance of multiple Orders of Protection against the defendant and in favor co-conspirator Zaheda Gonzalez's sister, see Def.'s Mot. at 5-6, the fact that the defendant was the subject of multiple Orders of Protection issued in Nassau County, between 2013 and 2017, raises the specter that, if released, the defendant will seek to intimidate the cooperating witnesses in this case. The same is true of the defendant's 1999 arrest for assaulting his wife, which led to a sentence of probation before judgment in Maryland. See id. at 5. Pretrial Services reached a similar conclusion in its Report. See Pretrial Report at 4 (listing Maryland assault case and "History of Protection Orders" as facts demonstrating that the defendant posed a danger to the community).

[5] For this reason, the defendant's reliance upon United States v. Ramirez Rodriguez, 20-CR-28 (D. Minn.) misses the mark. See Def.'s Mot., Exhibit 1, at 5 (describing how illegal reentry defendant was at a "substantially greater risk for complications from coronavirus" because of his diabetes).

At the outset of the pandemic, BOP measures which were implemented at the MDC, included the following:

- <u>Suspension of all social and legal visits</u>:  Social visits and legal visits have been suspended for 30 days, with case-by-case accommodations for attorney visits and legal calls.  Inmates will be provided additional inmate telephone minutes.

- <u>Inmate movement</u>:  All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- <u>Screening and testing of inmates</u>:  All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors were quarantined.  In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- <u>Modified Operations</u>:  The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

Effective on April 1, 2020, the BOP implemented additional procedures to ensure the safety and wellbeing of inmates, including:

- For a 14-day period, inmates in every BOP institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

- To the extent practicable, inmates will still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP, in conjunction with the United States Marshal's Services, is working to significantly decrease incoming movement to all BOP facilities.

As these new measures demonstrate, the BOP is closely monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public.

A recent case in the Southern District of New York highlights precisely what is at stake when defendants, using the guise of a potential medical infirmity, seek to take advantage of the COVID-19 pandemic.  In <u>United States v. McKenzie</u> (18-CR-834) (S.D.N.Y.), Judge Englemeyer released the defendant upon the defendant's representation that he was at a heightened risk of suffering severe complications from the disease because of his asthma.  <u>Id.</u> at ECF No. 441.  As a threshold matter, it is worth noting that, unlike the

instant case, the court in McKenzie had previously released the defendant on a bail package and had not found him a risk of flight. Id. The government opposed, noting, among other factors, the defendant's failure to mention any health issues or medication usage in his pretrial interview. Id. at ECF No. 442.[6] Still, the court released the defendant on a bond and conditions, cautioning that "it expect[ed] scrupulous compliance with all conditions of release, and that a violation of any condition [would] subject Mr. McKenzie to immediate remand."

The warning was to no avail. Within 48 hours of the defendant's release, pretrial services notified the court of a video showing the defendant "partying in very close proximity to numerous others." Id. April 2, 2020 Order. The defendant used his freedom not to ensure his health but, quite to the contrary, to have a good time with his friends without any regard for the likelihood that his festivities might needlessly spread the virus to others who actually were at heightened risk of suffering extreme complications. As the court noted, " to obtain release, the defendant had misled the Court by feigning genuine concern about contracting COVID-19 . . . exposed his family and friends to the risk of contracting COVID-19 from him, to the extent that he might already have contracted it at the MCC . . . and mocked the efforts of other high-risk inmates in the MCC and elsewhere who without ulterior motives are today desperately seeking release from jail to reduce their risk of contracting this virulent disease that has killed thousands." Id. April 6, 2020 Order, ECF No. 457.

Despite the Court's desire to detain the defendant, it was handcuffed because to do so would "endanger others' health and safety. . . . [the defendant]'s frolic in close proximity to numerous others during his recent taste of liberty alone potentially exposed him to COVID-19. To remand him now would potentially expose United States marshals, BOP officials, fellow MCC inmates, and others in his presence to the virus. These persons, including the other inmates, deserve better." Id. at ECF No. 455. Thus, the defendant was permitted to remain on home detention.

Likewise, here there is cause for concern. The defendant has presented no evidence of any medical condition that increases his risk of COVID-19 exposure and is presently charged with using the personal identifying information of other individuals to defraud financial institutions of at least $1.3 million. Thus, the Court should conclude that the defendant, like the defendant in McKenzie, could pose a risk of misusing his release to enjoy his freedom in a manner that will needlessly spread the virus.

In sum, BOP is taking proper precautions and the defendant is not uniquely situated with respect to the risk of infection of COVID-19, and his personal circumstances do not overcome the significant risk of flight and danger he would pose if released.

---

[6] Likewise, the defendant's Pretrial Report states that the defendant informed Pretrial Services that "he is in good physical health with no medical problems reported." See Pretrial Report at 2.

10

Accordingly, the defendant has not presented a "compelling reason" for his release under Section 3142(i). Based on this information, and because the defendant poses an extremely serious risk of flight and a danger to the community, the Permanent Order of Detention should remain in effect.

## CONCLUSION

For the reasons set forth above, the defendant should remain remanded pending trial.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/
Bradley T. King
Assistant U.S. Attorney
(631) 715-7875

cc: Maureen Hoerger, Esq. (by ECF and E-mail)

11